IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | | |
|---|---|---|
| **KESHEA TYRELL,** | * | |
| 396 Saratoga Ave. Apt. 5M | | |
| Brooklyn, NY 11233 | * | |
| *Plaintiff,* | * | CIVIL CASE NO._____ |
| v. | * | |
| **THE BOARD OF TRUSTEES OF ANNE ARUNDEL COMMUNITY COLLEGE,** | * | |
| 101 College Parkway | * | |
| Arnold, Maryland 21012 | | |
| | * | |
| SERVE:   **Dawn Lindsay, President** | | |
|          Anne Arundel Community College | * | |
|          101 College Parkway | | |
|          Arnold, Maryland 21012 | * | |
| *Defendant.* | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT

Plaintiff Keshea Tyrell ("Ms. Tyrell") through counsel makes this Complaint against the Board of Trustees of Anne Arundel Community College ("AACC") for violations of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*; Title II of the American with Disabilities Act, 42 U.S.C. § 12132 *et seq.*; and Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq*.  Ms. Tyrell seeks declaratory and injunctive relief, an award of compensatory damages, and an award of attorneys' fees and costs.

## JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 28 U.S.C. §1331 in that this action asserts violations of rights secured by the laws of the United States.

1

2. Venue is proper in this Court in accordance with 28 U.S.C. § 1391(b), as the events giving rise to the claim occurred in the District of Maryland, and there is no other district in which this action may be brought.

**PARTIES**

3. At all times relevant to this Complaint, Ms. Tyrell was a student enrolled in AACC, and was a resident of New York.

4. AACC is a community college located in Arnold, Anne Arundel County, Maryland. It has a partnership with the University of Maryland Baltimore (UMB) Graduate School for a Collaborative Physician Assistant Program ("Program") in which students complete a Master of Science in Health Science from UMB and a Certificate of Physician Assistant Studies from AACC.

5. AACC receives federal assistance in various forms, including financial aid.

**FACTS COMMON TO ALL COUNTS**

6. Ms. Tyrell is a thirty-two-year-old (32) African American female, who moved to the United States from Guyana when she was fifteen (15) years old.

7. At age thirteen (13), Ms. Tyrell was diagnosed with Sickle cell disease (SCD), which is a condition that affects the red blood cells, causing painful episodes of "sickling."

8. SCD is particularly common among those whose ancestors came from sub-Saharan Africa; Spanish-speaking regions in the Western Hemisphere (South America, the Caribbean, and Central America); Saudi Arabia; India; and Mediterranean countries.

9. Ms. Tyrell was diagnosed with SCD after experiencing a sickle cell crisis, which occurs when the sickled cells get stuck in the small blood vessels of the chest, stomach, and joints.

10. There is no medication to cure or treat SCD. Rather, a person with SCD learns ways to try to prevent a crisis and how to treat the symptoms of a crisis when one occurs.

11. Over the years, Ms. Tyrell has learned how to try to prevent a crisis and to manage effectively the symptoms of a crisis when one occurs.

12. The last crisis Ms. Tyrell experienced was in 2011.

13. Ms. Tyrell began her studies at AACC on May 23, 2016.

14. Prior to enrolling in AACC, Ms. Tyrell had earned a Bachelor's degree from Long Island University and had served as an HIV counselor for three years in New York City.

15. Ms. Tyrell's dream has been to work in the medical field. Growing up in Guyana, she observed firsthand a shortage of medical providers. Ms. Tyrell is an active member of her Church. She planned to go to Guyana and other impoverished countries through her Church's missionary work to provide much needed medical care.

16. At AACC, Ms. Tyrell was a member of the 2018 cohort, which consisted of roughly fifty-two (52) students. Of those fifty-two (52) students, nine (9), including Ms. Tyrell, were African American.

17. The Program is twenty-five months long and divided into two parts: didactic and, then, clinicals. The entire Program is led by roughly six (6) AACC faculty members. The majority of the faculty members are White.

18. Ms. Tyrell was progressing in the Program without incident until Timothy Parker, the Program's Academic Coordinator, prodded Ms. Tyrell to reveal she had SCD.

19. Ms. Tyrell had asked a number of questions of Professor Parker during a lecture about SCD. Shortly thereafter, Professor Parker asked Ms. Tyrell whether she had SCD.

20. Ms. Tyrell reluctantly admitted to Professor Parker she had SDC, information which is personal and confidential.

21. Professor Parker then shared Ms. Tyrell's health information with Mary Jo Bondy, the Program's Interim Director without Ms. Tyrell's permission.

22. Professor Parker and Dr. Bondy presaged Ms. Tyrell that her "sickness" was a "limitation" and counseled Ms. Tyrell to "consider another career."

23. For example, on February 13, 2017, in room AMIL 104, Dr. Bondy told Ms. Tyrell she "should consider another career since [she had] Sickle cell and [her] medical education may be wishy washy."

24. Professor Parker also disclosed Ms. Tyrell's health condition to Professor Denis Rivenburgh, the former Chairman of the Program, who approached Ms. Tyrell in an open hallway telling her that she "needed to update her medical because of what he was told by Professor Parker."

25. On April 7, 2017, Ms. Tyrell's cohort took the Objective Structured Clinical Examination ("OSCE"), which is taken before a student can proceed to clinicals. It is a method of evaluating student competencies in communication skills, history taking and physical examination by the organ system.

26. Although Ms. Tyrell was promptly told she had failed the OSCE, she did not receive a grade until July 27, 2017, while all other students in her cohort received their grades within two (2) weeks of the OSCE.

27. When Ms. Tyrell initially did not receive a grade, she contacted Dr. Tiffany Maxwell, the Program's Didactic Coordinator, to inquire. Dr. Maxwell reported she had failed but assured Ms. Tyrell she did not score below a sixty-five percent (65%). (Three months later, AACC reported Ms. Tyrell had earned a 61% on the OSCE).

28. According to the Couse Syllabus for the OSCE, a student must score 75% to pass. However, if a student scores between a 65% and a 74.9%, the student will have an opportunity to remediate the competencies to pass the skill.

29. A total of sixteen (16) students failed the OSCE, including Ms. Tyrell.

30. Of those sixteen (16) students, Ms. Tyrell was the only student who was African American and perceived to have a disability because of a distinctively African American illness.

31. Of the sixteen (16) students, everyone except for Ms. Tyrell was allowed to immediately retake the OSCE.

32. Of the fifteen (15) students who took the OSCE a second time, three (3) failed. Those three (3) students received special topics for a one-day three (3) hour course, completion of which enabled them to proceed without penalty.

33. AACC refused to allow Ms. Tyrell to retake the OSCE and did not allow her to take a special topic three-hour course. Rather, AACC forced her to remediate for an entire semester, which substantially pushed back Ms. Tyrell's graduation date.

34. According to AACC, Ms. Tyrell had to remediate for an entire semester because, at the time of the OSCE, Ms. Tyrell was on academic probation.

35. There was no reason for Ms. Tyrell to be on probation because she had a sufficiently high GPA.

5

36. Ms. Tyrell believed she had 3.0 GPA until she received an email from Dr. Maxwell dated March 30, 2017, informing her she had to attend tutoring as part of her "academic jeopardy agreement." Prior to receiving that email, Ms. Tyrell had never been warned or told she was in academic jeopardy and had never been presented with an "academic jeopardy agreement."

37. In response, Ms. Tyrell met with Dr. Maxwell to inform Dr. Maxwell she had never been told she was on probation and to dispute AACC's contention she was on probation.

38. According to Dr. Maxwell, Ms. Tyrell was on probation because she had received a 79.96% or a "C" in pathopharmacology.

39. Ms. Tyrell had appealed her pathopharmacology grade to Dr. Bondy and Professor Hewes, her instructor, because exam questions had been keyed incorrectly and, if fixed, her grade would have been raised to a B.

40. Dr. Bondy and Professor Hewes denied Ms. Tyrell's appeal.

41. Even if Ms. Tyrell's GPA was less than a 3.0 at the time of the OSCE, there were sixteen (16) other students who had less than a 3.0 GPA and who had nonetheless progressed from the didactic curriculum to clinicals. None of those students were African American and perceived to have a disability because of a distinctively African American illness.

42. Moreover, all the other students in her cohort that were actually on academic probation had received official written notification of such from AACC and were given the opportunity to meet with their advisors to develop an academic plan.

43. Given the events leading up to and following the OSCE, on June 2, 2017, Ms. Tyrell filed a complaint of discrimination with Elizabeth Appel, AACC's Dean of the School of Health Sciences and copied Dr. Bondy on the correspondence. In her complaint, Ms. Tyrell

claimed she was being discriminated against because she was African-American, had a distinctively African American illness and was being penalized because of a false perception that she was disabled.

44. The Program's faculty members at AACC were made aware of Ms. Tyrell's complaint.

45. Ms. Tyrell's complaint was forwarded to AACC's compliance officer for investigation.

46. To Ms. Tyrell's knowledge, the compliance officer never completed its investigation of her complaint; certainly, the officer never communicated her findings to Ms. Tyrell.

47. By letter dated July 21, 2017, Ms. Tyrell, through counsel, wrote AACC to put them on notice again of Ms. Tyrell's claims of discrimination and to request that she be treated fairly, as Ms. Tyrell's primary objective was completing the Program.

48. On August 11, 2017, Ms. Tyrell took the OSCE for a second time and passed.

49. Despite the fact her cumulative GPA was above a 3.0 after retaking the OSCE, Ms. Tyrell remained on academic probation.

50. By letter dated August 28, 2017, AACC, through counsel, denied Ms. Tyrell's claims of discrimination and threatened to countersue Ms. Tyrell if she persisted with her claims.

51. On September 15, 2017, Ms. Tyrell was scheduled to meet with AACC Professors Ard and Cook to discuss the OSCE. To her surprise, at that meeting she was presented with a Notice of Academic Dishonesty for allegedly cheating.

52. According to Professor Ard, Ms. Tyrell had cheated by attempting to gain information about the OSCE in advance of the test.

53. When Ms. Tyrell protested, Professor Ard made reference to the fact she had made a complaint of discrimination.

54. Ms. Tyrell adamantly denied Professor Ard's accusation and refused to accept AACC's proposed sanction, which would have required Ms. Tyrell to admit wrongdoing and write a paper on the importance of integrity.

55. Consequently, a hearing was scheduled before AACC's Academic Integrity Committee, which was comprised of more than ten faculty members and students, none of whom had any affiliation with the Program at AACC.

56. At the hearing on October 20, 2017, Professor Ard and Dr. Bondy appeared on behalf of the Program. Through a school representative, Professor Ard presented the case against Ms. Tyrell.

57. Ms. Tyrell defended against the Program's claims at the hearing. Although Ms. Tyrell had counsel present, she was required to put on the defense herself.

58. By letter dated October 24, 2017, the Academic Integrity Committee notified Ms. Tyrell it had found she had <u>not</u> violated AACC's Academic Integrity Policy.

59. After being exonerated of the charges, by letter dated November 15, 2017, Ms. Tyrell wrote Dr. Dawn Lindsay, the president of AACC, to complain of retaliation.

60. In her complaint to Dr. Lindsay, Ms. Tyrell asserted that she was being retaliated against because she had made a complaint of discrimination. Ms. Tyrell cited specific examples of AACC's retaliatory actions, including the fact she had been falsely accused of cheating and had had a recent issue with Professor Parker.

61. Just prior to writing Dr. Lindsay, Professor Parker had intentionally disturbed Ms. Tyrell's test taking in an effort to cause her distress and impair her grade.

62. In the fall of 2016, Ms. Tyrell had been diagnosed with anxiety for the first time in her life. Her primary care physician requested that Ms. Tyrell be given additional time to complete tests. AACC granted the accommodation shortly after the request was made, which was before she disclosed she had SCD.

63. In light of her accommodation, Ms. Tyrell usually took exams in a separate room from the rest of her class, often with two other students who had also been granted the same or similar accommodations.

64. Professor Parker was well aware of Ms. Tyrell's accommodation.

65. On the day of the test, Professor Parker did not make or try to make a workable computer available to Ms. Tyrell at AACC to take the test. Despite Ms. Tyrell's pleas for help and assistance, Professor Parker ignored her. Eventually, after approximately thirty-eight minutes, Ms. Tyrell resolved AACC's computer issues on her own. Given the significant delay, Ms. Tyrell did not have sufficient time to complete the test on the computer.

66. After Ms. Tyrell ran out of time, Professor Parker gave her a paper copy of the test to finish where she had left off. Although Ms. Tyrell was given the opportunity to finish taking the test using the paper copy, she was not able to go back onto the computer to check her previous answers.

67. Professor Parker should have given Ms. Tyrell the paper copy when it was first known to him that there was a technological issue with AACC's computer. In fact, it has been Professor Parker's practice to immediately give paper copies of a test to other students if they encountered technological issues with AACC's computer.

68. Dr. Lindsey never responded to Ms. Tyrell's complaint. Rather, Dean Appel responded on December 21, 2017, after Ms. Tyrell had been dismissed from the Program on December 20, 2017.

69. By letter dated December 20, 2017, AACC dismissed Ms. Tyrell from the Program.

70. According the December 20 correspondence, Ms. Tyrell was dismissed because she failed the PHA 223 Clerkship.

71. AACC took the position that Ms. Tyrell failed the PHA Clerkship because of an alleged incomplete assignment.

72. Ms. Tyrell had completed all assignments that were made known to her by Professor Parker. However, on December 14, 2017, Professor Parker had emailed Ms. Tyrell to inform her that he had added assignments and that these assignments must be complete by 7:00 a.m. on December 15, 2017.

73. Ms. Tyrell did not receive Professor Parker's email until December 15, 2017 at 9:00 a.m.

74. Ms. Tyrell had spent December 14 in the hospital because her sister and nephew, who also have SCD, were both experiencing a crisis.

75. Ms. Tyrell had finished and submitted the additional assignments by 10:15 a.m. on December 15, 2017 and earned a 100% on the assignments.

76. Ms. Tyrell promptly appealed her dismissal to the Committee on Progression, which was composed of Professor Parker, Dr. Maxwell, and two members from the University of Maryland.

77. In her appeal, Ms. Tyrell complained she had been discriminated and retaliated against and contrasted AACC's mistreatment of her to its more generous treatment of White students and students without distinctively African American illnesses.

78. By letter dated January 10, 2018, the Committee on Progress recommended that Ms. Tyrell's dismissal be upheld, citing a strict reading of AACC's policies.

79. AACC has a history of failing to enforce its policies against White students and students who are not perceived to be disabled because of a distinctively African American illness.

80. For example, a White student submitted her assignments after the deadline, but did not receive a failing grade like Ms. Tyrell.

81. AACC officials have condoned cheating by and changed grades for White students and those students without perceived disabilities caused by a distinctively African American illness, which has allowed those students to progress through the Program.

## CAUSES OF ACTION

### COUNT I
### DISABILITY DISCRIMINATION - DIFFERENT TREATMENT
### PURSUANT TO SECTION 504 OF THE REHABILITATION ACT
### AND TITLE II OF THE ADA

82. The facts alleged above are incorporated by reference.

83. AACC falsely perceived Ms. Tyrell to be "disabled" after learning she had SCD and took materially adverse action against Ms. Tyrell that culminated in her dismissal from the Program.

84. AACC treated White students and those who were not perceived to have a disability because of a distinctively African American student better than Ms. Tyrell in that it

not only failed to enforce its policies against those students, but actively changed grades to allow those students to progress through the Program.

**WHEREUPON**, Ms. Tyrell respectfully requests this Honorable Court grant the following relief:

    A.    Enter a judgment in favor of Ms. Tyrell and against AACC for compensatory damages;

    B.    Enter a declaratory judgment that AACC violated Ms. Tyrell's rights under the laws of the United States;

    C.    Enter an injunction compelling AACC to reinstate Ms. Tyrell to the PA Program and refrain from further discriminatory and retaliatory actions;

    D.    Assess reasonable attorneys' fees and costs of suit in favor of Ms. Tyrell and against AACC; and

    E.    Grant Ms. Tyrell such other and further relief as the nature of her cause may warrant.

## COUNT II
## DISABILITY DISCRIMINATION - HOSTILE ENVIRONMENT
## PURSUANT TO SECTION 504 OF THE REHABILITATION ACT
## AND TITLE II OF THE ADA

85.    The facts alleged in Paragraphs 1 and 81 above are incorporated by reference.

86.    AACC created a hostile learning environment for Ms. Tyrell after learning she had SCD. AACC's harassment of Ms. Tyrell was so severe or pervasive that it interfered with her schooling and culminated in her dismissal.

**WHEREUPON**, Ms. Tyrell respectfully requests this Honorable Court grant the following relief:

A. Enter a judgment in favor of Ms. Tyrell and against AACC for compensatory damages;

B. Enter a declaratory judgment that AACC violated Ms. Tyrell's rights under the laws of the United States;

C. Enter an injunction compelling AACC to reinstate Ms. Tyrell to the PA Program and refrain from further discriminatory and retaliatory actions;

D. Assess reasonable attorneys' fees and costs of suit in favor of Ms. Tyrell and against AACC; and

E. Grant Ms. Tyrell such other and further relief as the nature of her cause may warrant.

## COUNT III
## RETALIATION PURSUANT TO SECTION 504 OF THE REHABILITATION ACT AND TITLE II OF THE ADA

87. The facts alleged in Paragraphs 1 and 81 above are incorporated by reference.

88. Ms. Tyrell engaged in protected activity by making a series of complaints of discrimination.

89. Immediately after Ms. Tyrell made her initial complaint of discrimination, AACC took material adverse action against her, including, but not limited to, falsely accusing Ms. Tyrell of cheating, creating a hostile environment, and dismissing her from the Program.

**WHEREUPON**, Ms. Tyrell respectfully requests this Honorable Court grant the following relief:

A. Enter a judgment in favor of Ms. Tyrell and against AACC for compensatory damages;

B. Enter a declaratory judgment that AACC violated Ms. Tyrell's rights under the laws of the United States;

C. Enter an injunction compelling AACC to reinstate Ms. Tyrell to the PA Program and refrain from further discriminatory and retaliatory actions;

D. Assess reasonable attorneys' fees and costs of suit in favor of Ms. Tyrell and against AACC; and

E. Grant Ms. Tyrell such other and further relief as the nature of her cause may warrant.

## COUNT IV
## RACE DISCRIMINATION PURSUANT TO TITLE VI

90. The facts alleged in Paragraphs 1 and 81 above are incorporated by reference.

91. AACC took adverse action against Ms. Tyrell because of her race and because she has a disease associated with African ancestry.

**WHEREUPON**, Ms. Tyrell respectfully requests this Honorable Court grant the following relief:

A. Enter a judgment in favor of Ms. Tyrell and against AACC for compensatory damages;

B. Enter a declaratory judgment that AACC violated Ms. Tyrell's rights under the laws of the United States;

C. Enter an injunction compelling AACC to reinstate Ms. Tyrell to the PA Program and refrain from further discriminatory and retaliatory actions;

D.   Assess reasonable attorneys' fees and costs of suit in favor of Ms. Tyrell and against AACC; and

E.   Grant Ms. Tyrell such other and further relief as the nature of her cause may warrant.

## COUNT V
## RETALIATION PURSUANT TO TITLE VI

92.   The facts alleged in Paragraphs 1 and 81 above are incorporated by reference.

93.   Ms. Tyrell engaged in protected activity by making a series of complaints of discrimination and retaliation with AACC.

94.   Immediately after Ms. Tyrell made her initial complaint of discrimination, AACC took material adverse action against her, including, but not limited to, falsely accusing Ms. Tyrell of cheating; creating a hostile environment; and dismissing her from the Program.

**WHEREUPON**, Ms. Tyrell respectfully requests this Honorable Court grant the following relief:

A.   Enter a judgment in favor of Ms. Tyrell and against AACC for compensatory damages;

B.   Enter a declaratory judgment that AACC violated Ms. Tyrell's rights under the laws of the United States;

C.   Enter an injunction compelling AACC to reinstate Ms. Tyrell to the PA Program and refrain from further discriminatory and retaliatory actions;

D.   Assess reasonable attorneys' fees and costs of suit in favor of Ms. Tyrell and against AACC; and

E.   Grant Ms. Tyrell such other and further relief as the nature of her cause may warrant.

          /s/
_____
ROBIN R. COCKEY, Federal Bar No.02657
ASHLEY A. BOSCHÉ, Federal Bar No. 28800
Cockey, Brennan & Maloney, PC
313 Lemmon Hill Lane
Salisbury, MD 21801
410-546-1750
Fax: 410-546-1811
rrdesq@cbmlawfirm.com
bosche@cbmlawfirm.com
*Attorneys for Plaintiff*